DSS:EMN/AH/DAL/SPN/BDM
F.#2014R00190

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -

JOSÉ HAWILLA,
TRAFFIC SPORTS USA, INC., and
TRAFFIC SPORTS INTERNATIONAL, INC.,

       Defendants.

- - - - - - - - - - - - - - - - - - -X

**I N F O R M A T I O N**

Cr. No. <u>14-609 (RJD)</u>
(T. 18, U.S.C., §§
981(a)(1)(C), 982(a)(1),
982(b), 1349, 1512(b)(3),
1512(c)(2), 1956(h),
1962(d), 1963, 1963(a),
1963(m) and 3551 <u>et seq.</u>;
T. 21, U.S.C., § 853(p);
T. 28, U.S.C. § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

<u>INTRODUCTION TO ALL COUNTS</u>

     At all times relevant to this Information, unless otherwise indicated:

I.   <u>The Enterprise</u>

     1.   The Fédération Internationale de Football Association ("FIFA") and its six constituent continental confederations – the Confederation of North, Central American and Caribbean Association Football ("CONCACAF"), the Confederación Sudamericana de Fútbol ("CONMEBOL"), the Union des Associations Européennes de Football ("UEFA"), the Confédération Africaine de Football ("CAF"), the Asian Football Confederation ("AFC"), and the Oceania Football Confederation ("OFC") –

together with affiliated regional federations, national member associations, and sports marketing companies, collectively constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise was engaged in, and its activities affected, interstate and foreign commerce.

2.    The principal purpose of the enterprise was to regulate and promote the sport of soccer worldwide. The members of the enterprise carried out this purpose by using a variety of methods and means, including creating and enforcing uniform standards and rules, organizing international competitions, and commercializing the media and marketing rights associated with the sport. The members of the enterprise, as well as individuals and entities employed by and associated with the enterprise, frequently engaged in banking and investment activities with United States financial institutions.

3.    The enterprise operated in the Eastern District of New York and elsewhere, including overseas.

2

A.    FIFA

4.    FIFA was the international body governing organized soccer, commonly known outside the United States as football.  FIFA was an entity registered under Swiss law and headquartered in Zurich, Switzerland.  FIFA was composed of as many as 208 member associations, each representing organized soccer in a particular nation or territory, including the United States and four of its overseas territories.  The United States first became affiliated with FIFA in 1914; Puerto Rico first became affiliated with FIFA in 1960, with Guam, American Samoa, and the United States Virgin Islands following suit in the 1990s.  At various times, FIFA maintained offices both in Zurich and elsewhere in the world, including in the United States, where FIFA maintained a development office since at least 2011.

5.    Each of FIFA's member associations also was a member of one of the six continental confederations recognized by FIFA: CONCACAF, CONMEBOL, UEFA, CAF, AFC, and OFC.  Since at least 1996, under FIFA's statutes, no national soccer association could become a member of FIFA without first joining one of the six continental confederations.  Since at least 2004, member associations were required to pay to FIFA annual dues, known as subscriptions.

3

6.     FIFA was governed by: a congress composed of its member associations, which acted as the association's highest legislative body; an executive committee, which acted as the executive body; and a general secretariat, which acted as the administrative body.  FIFA also had a president, who represented the association worldwide and was responsible for the implementation of decisions.  FIFA also operated several standing committees, including a committee that organized Olympic soccer qualifying tournaments, whose members included soccer officials from various national member associations. FIFA also operated through a number of subsidiaries, including subsidiaries that assisted with FIFA's media and marketing activities.

7.     The FIFA congress was composed of delegates from each of its member associations, as well as observers appointed by each of the confederations.  Among other things, the congress was responsible for amending FIFA's statutes and electing the FIFA president.  The congress convened in ordinary sessions biennially or annually, and at other times in extraordinary sessions, in various countries around the world, including the United States.

8.     The FIFA executive committee, often referred to as the "ExCo," was composed of the FIFA president and a number

4

of ordinary members, some of whom also held the title vice
president.  The president was elected by the FIFA congress.  The
vice presidents and ordinary members were appointed by the
confederations.  Each confederation was entitled to appoint a
specific number of vice presidents and ordinary members, as set
forth in the FIFA statutes.  Since at least 1996, the executive
committee was required by FIFA statutes to meet at least twice
per year.  The executive committee held meetings at FIFA's
headquarters in Zurich, as well as in various countries around
the world, including the United States.

   9. Among other duties, the executive committee was
responsible for selecting the host nations of FIFA tournaments,
including, among others, the World Cup, the Women's World Cup,
the Confederations Cup, the Under-20 World Cup, the Under-20
Women's World Cup, the Under-17 World Cup, the Under-17 Women's
World Cup and the Club World Cup.

   10. The World Cup, the sport's premier event, was a
quadrennial international tournament involving the senior
national men's teams of 24 and, beginning in 1998, 32 nations.
In selecting the host nation for the World Cup, the executive
committee typically followed a process in which bid committees
for the competing nations campaigned for votes among the members
of the executive committee.  Following this process, and at

least six years prior to each World Cup, the executive committee typically held a vote in which its members cast their votes via secret ballot.  The winners, or host nations, for the World Cups from 1990 to 2022, as well as the other bidding nations that maintained their bids to the end of the process, are reflected in the table below:

| World Cup | Date Selected by the ExCo | Winning Nation | Other Bidding Nation/Nations |
|---|---|---|---|
| 1990 | May 19, 1984 | Italy | Soviet Union |
| 1994 | July 4, 1988 | United States | Morocco Brazil |
| 1998 | July 2, 1992 | France | Morocco |
| 2002 | May 31, 1996 | Japan/South Korea | Mexico |
| 2006 | July 6, 2000 | Germany | South Africa England Morocco |
| 2010 | May 15, 2004 | South Africa | Morocco Egypt |
| 2014 | October 30, 2007 | Brazil | - |
| 2018 | December 2, 2010 | Russia | Spain/Portugal Netherlands/Belgium England |
| 2022 | December 2, 2010 | Qatar | United States South Korea Japan Australia |

11.  Since at least 1996, under FIFA's statutes, the six continental confederations had certain rights and obligations, including, among other things, that they comply

with and enforce FIFA's statutes, regulations, and decisions and work closely with FIFA to further FIFA's objectives and organize international soccer competitions.

12.   FIFA's purpose was, among other things, to develop and promote the game of soccer globally by organizing international competitions and creating and enforcing rules that govern the confederations and member associations.   FIFA financed its efforts in significant part by commercializing the media and marketing rights associated with the World Cup. According to its published income statement for the 2007-2010 financial period, FIFA had total revenues of $4.189 billion, 83% of which ($3.480 billion) was attributable to the sale of television and marketing rights to the 2010 World Cup.   FIFA's profits during this same period were $631 million.   FIFA, in turn, helped finance the confederations and their member associations, including by providing funds through the Financial Assistance Program and the Goal Program.

13.   FIFA first instituted a written code of ethics in October 2004, which code was revised in 2006 and again in 2009 (generally, the "code of ethics").   The code of ethics governed the conduct of soccer "officials," which expressly included, among others, various individuals with responsibilities within FIFA, the confederations, member associations, leagues, and

7

clubs.  Among other things, the code of ethics provided that
soccer officials were prohibited from accepting bribes or cash
gifts and from otherwise abusing their positions for personal
gain.  The code of ethics further provided, from its inception,
that soccer officials owed certain duties to FIFA and its
confederations and member associations, including a duty of
absolute loyalty.  By 2009, the code of ethics explicitly
recognized that FIFA officials stand in a fiduciary relationship
to FIFA and its constituent confederations, member associations,
leagues, and clubs.

    B.   The Continental Confederations

       14.  In addition to providing representatives who
helped to govern FIFA, the six continental confederations worked
closely with FIFA and one another to organize international
soccer competitions and carry out FIFA directives on a regional
basis.  The leaders and representatives of the confederations
conducted business with one another, as well as with the leaders
and associates of FIFA, throughout the year at locations around
the world, including in the United States.  Each confederation
was governed by its own congress, general secretariat, executive
committee and standing committees.  From time to time, some of
the confederations, like FIFA, also operated through

subsidiaries, including subsidiaries that assisted with media and marketing activities.

15.  CONCACAF was a continental soccer confederation incorporated, since 1994, as a non-profit corporation in Nassau, Bahamas.  CONCACAF comprised as many as 41 member associations, representing organized soccer in North America, Central America, the Caribbean and three South American countries.  The United States and two of its overseas territories, Puerto Rico and the United States Virgin Islands, were members of CONCACAF.  From approximately 1990 to 2012, CONCACAF's principal administrative office was located in New York, New York, where the former general secretary was based (until the end of 2011) and where CONCACAF regularly conducted business.  Beginning in 2012, CONCACAF's principal administrative office was located in Miami, Florida, where the new general secretary was based.  CONCACAF also conducted business at various times throughout the United States, including in the Eastern District of New York, as well as in foreign countries within and outside the confederation. Among other tournaments, CONCACAF organized the Gold Cup, featuring the men's national teams from CONCACAF and, from time to time, other confederations, as well as a tournament featuring the top men's professional league - or club - teams.

16.   CONMEBOL was a continental soccer confederation domiciled in Paraguay and headquartered in Asunción, Paraguay and, later, Luque, Paraguay.  CONMEBOL comprised as many as 10 member associations, representing organized soccer in South America.  Among other tournaments, CONMEBOL organized the Copa América, featuring the men's national teams of its ten members and two non-CONMEBOL national teams that were invited to participate, as well as tournaments featuring the top men's club teams.  Since 1993, the United States has participated in the Copa América as an invitee three times, and in 2016 the United States will host and participate in a special edition of the tournament to commemorate its centennial.

17.   UEFA was a continental soccer confederation registered as a legal entity under the laws of Switzerland and headquartered in Nyon, Switzerland.  UEFA comprised as many as 54 member associations, representing organized soccer in Europe and certain nations in the Middle East and Central Asia.  Among other tournaments, UEFA organized the European Championship, featuring the top men's national teams, as well as tournaments featuring the top men's club teams.

18.   CAF was a continental soccer confederation headquartered in Cairo, Egypt.  CAF comprised as many as 56 member associations, representing organized soccer in Africa.

10

Among other tournaments, CAF organized the Africa Cup of
Nations, featuring the top men's national teams, as well as a
tournament featuring the top men's club teams.

19.   AFC was a continental soccer confederation
registered as a legal entity under the laws of Malaysia and
headquartered in Kuala Lumpur, Malaysia.  AFC comprised as many
as 47 member associations, representing organized soccer in
Asia, as well as on the island of Guam, a territory of the
United States.  Among other tournaments, AFC organized the Asian
Cup, featuring the top men's national teams, as well as a
tournament featuring the top men's club teams.

20.   OFC was a continental soccer confederation
incorporated under the laws of New Zealand and headquartered in
Auckland, New Zealand.  OFC comprised as many as 14 member
associations, representing organized soccer in New Zealand and
the Pacific Island countries, including American Samoa, a
territory of the United States.  Among other tournaments, OFC
organized the Nations Cup, a tournament founded in 1996
featuring the top men's national teams, as well as a tournament
featuring the top men's club teams.

21.   The confederations also organized World Cup
qualifying matches, using a variety of formats, and, from time

to time, worked together to organize inter-confederation competitions, often with the support and approval of FIFA.

    C.   The Regional Federations and National Associations

    22.  In addition to being members of FIFA and their respective continental confederations, some of the national associations were also members of smaller, regional federations.

    23.  For example, CONCACAF's member associations were organized into three smaller regional federations: the Caribbean Football Union ("CFU"), the Central American Football Union ("UNCAF"), and the North American Football Union ("NAFU"). The United States Soccer Federation was thus a member association of CONCACAF as well as NAFU, while Puerto Rico and the United States Virgin Islands were both members of CONCACAF and CFU.

    24.  The national associations promoted, organized, and governed soccer, often including club-level soccer, within individual nations. The national association of the United States was the United States Soccer Federation ("USSF"), which was based in Chicago, Illinois.

    25.  The national associations, also often referred to as "federations," worked together to organize exhibition soccer matches between national teams, known as "friendlies," which also took place on the club level. Friendlies took place in

12

venues throughout the United States, including the Eastern
District of New York, as well as in other venues worldwide.

    D.    The Sports Marketing Companies

        26.    FIFA, the continental confederations, the
regional federations and the national member associations often
entered into contracts with sports marketing companies to
commercialize the media and marketing rights to various soccer
events, including the World Cup and other tournaments, World Cup
and Olympic qualifiers, friendlies, and other events, as well as
other rights associated with the sport.  These sports marketing
companies, including multinational corporations with
headquarters, offices, or affiliates located in the United
States, often acquired an array of media and marketing rights,
including television and radio broadcasting rights, advertising
rights, sponsorship rights, licensing rights, hospitality
rights, and ticketing rights.  These sports marketing companies
often sold these rights to, among others, television and radio
stations, sponsors, and sub-licensees, including those located
in the United States.

        27.    The revenue generated by the commercialization of
the media and marketing rights associated with soccer
constituted an essential source of revenue for the enterprise.

13

The United States was an increasingly important and lucrative market for the commercialization of these rights.

II.  The Defendants

28.  The defendant JOSÉ HAWILLA was an individual employed by and associated with the enterprise.  In or about and between 1980 and the present, HAWILLA was the founder and owner of the Traffic Group, a multinational sports marketing company based in São Paulo, Brazil.  In South America, Traffic's operations focused on, among other things, the commercialization of soccer through the purchase and sale of media and marketing rights associated with the sport.  HAWILLA, a Brazilian citizen, resided in São Paulo, where he oversaw Traffic's principal operations and staff.

29.  The defendant TRAFFIC SPORTS USA, INC. was an entity employed by and associated with the enterprise. Beginning in or about 1990, HAWILLA expanded Traffic's operations to the United States, partnering with and later acquiring a Florida company called Inter/Forever Sports, Inc., which was renamed TRAFFIC SPORTS USA, INC. (collectively, "TRAFFIC USA") in or about 2003.  TRAFFIC USA was a Florida corporation that had its headquarters and principal place of business in Miami and was involved in the purchase and sale of media and marketing rights associated with soccer in the United

14

States and other parts of the CONCACAF region.   TRAFFIC USA also participated in the ownership and management of the North American Soccer League ("NASL"), a division of United States men's club soccer sanctioned by the USSF, as well as the ownership and management of multiple clubs within the league. The NASL was headquartered in New York City and its teams were based in various cities in Canada and the United States, including in the Eastern District of New York.

30.   The defendant TRAFFIC SPORTS INTERNATIONAL, INC. ("TRAFFIC INTERNATIONAL") was an entity employed by and associated with the enterprise.   TRAFFIC INTERNATIONAL was a British Virgin Islands corporation.   In a lawsuit filed in Florida state court in 2011, TRAFFIC INTERNATIONAL described itself as "one of the leading sports event and management companies in the world, with primary emphasis on the sport of soccer."

31.   From time to time, TRAFFIC USA and TRAFFIC INTERNATIONAL did business with each other and with other entities within the Traffic Group, including the Brazilian affiliate, Traffic Assessoria e Comunicações S/C Ltda. ("Traffic Brazil").   Except where otherwise indicated, TRAFFIC USA, TRAFFIC INTERNATIONAL, and Traffic Brazil, along with their

affiliates, predecessors, and assigns, are referred to herein collectively as "Traffic" or the "Traffic Group."

32. In connection with their activities with the enterprise, HAWILLA and Traffic maintained business operations in the United States. In connection therewith, at various times, HAWILLA resided in and traveled to and from the United States, and he arranged for TRAFFIC USA employees, other Traffic employees, and other members of the enterprise to travel to and from the United States. In addition, HAWILLA, TRAFFIC USA, TRAFFIC INTERNATIONAL, and other Traffic affiliates used the wire facilities of the United States and engaged in banking and investment activities with United States financial institutions.

33. Traffic was privately held. Prior to 1999, HAWILLA controlled all outstanding shares of TRAFFIC INTERNATIONAL and Traffic Brazil and 50% of TRAFFIC USA. Between approximately 1999 and 2002, HAWILLA owned approximately 25% of TRAFFIC USA and a majority share of TRAFFIC INTERNATIONAL and Traffic Brazil, and an American private equity firm owned a minority share of TRAFFIC INTERNATIONAL and Traffic Brazil and approximately 75% of TRAFFIC USA. Beginning in 2002, HAWILLA controlled all outstanding shares of Traffic directly or through offshore holding companies as to which he owned an approximately 99% interest.

16

III. <u>The Defendants' Co-Conspirators</u>

34.   The identities of the following individuals and business entities are known to the United States Attorney:

35.   At various times relevant to this Information, Co-Conspirator #1 was a high-ranking official of FIFA and CONMEBOL.

36.   At various times relevant to this Information, Co-Conspirator #2 and Co-Conspirator #3 were senior executives of a group of companies under common ownership and control referred to individually and collectively below as the Intermediary.

37.   At various times relevant to this Information, Co-Conspirator #4 and Co-Conspirator #5 were senior executives of a group of companies under common ownership and control referred to individually and collectively below as Sports Marketing Company A.

38.   At various times relevant to this Information, Co-Conspirator #6 was a senior executive of a group of companies under common ownership and control referred to individually and collectively below as Sports Marketing Company B.

39.   At various times relevant to this Information, Co-Conspirator #7 was a senior executive of TRAFFIC USA and an official of FIFA.

40.   At various times relevant to this Information, Co-Conspirator #8 was a high-ranking official of FIFA, CONMEBOL, and one of FIFA's national member associations.

41.   At various times relevant to this Information, Co-Conspirator #9 was a senior executive of TRAFFIC USA, a high-ranking official of CONCACAF, and an official of FIFA.

42.   At various times relevant to this Information, Co-Conspirator #10 was a senior executive of TRAFFIC USA.

43.   At various times relevant to this Information, Co-Conspirator #11 was a high-ranking official of FIFA, CONCACAF, a regional federation, and one of FIFA's national member associations.

44.   At various times relevant to this Information, Co-Conspirator #12 was a high-ranking official of FIFA and CONCACAF.

45.   At various times relevant to this Information, Co-Conspirator #13 was a high-ranking official of FIFA and Confederação Brasileira de Futebol ("CBF"), Brazil's national soccer federation and one of FIFA's national member associations, and an official of CONMEBOL.

46.   At various times relevant to this Information, Co-Conspirator #14 was a senior executive of a group of companies under common ownership and control referred to

18

individually and collectively below as Sports Marketing Company C.

47.   At various times relevant to this Information, Co-Conspirator #15 was a high-ranking official of CBF and an official of FIFA and CONMEBOL.

48.   At various times relevant to this Information, Co-Conspirator #16 was a high-ranking official of FIFA and CBF.

49.   The foregoing officials of FIFA, CONCACAF, and other soccer governing bodies were bound by fiduciary duties to their respective organizations.

IV.   The Conspirators' Corruption of the Enterprise

50.   Certain individuals and entities employed by and associated with the enterprise, including the defendants JOSÉ HAWILLA, TRAFFIC SPORTS USA, INC., and TRAFFIC SPORTS INTERNATIONAL, INC., conspired with one another to use their positions within the enterprise to engage in schemes involving the offer, acceptance, payment, and receipt of undisclosed and illegal payments, bribes, and kickbacks.  Although they also helped pursue the principal purpose of the enterprise, HAWILLA and his co-conspirators corrupted the enterprise by engaging in various criminal activities, including fraud, bribery, and money laundering, in pursuit of personal and commercial gain.  HAWILLA also participated in the corruption of the enterprise by

19

conspiring with and aiding and abetting his co-conspirators in the abuse of their positions of trust and the violation of their fiduciary duties.

51.   To further their corrupt ends, HAWILLA and his co-conspirators provided each other with mutual aid and protection.  The conspirators engaged in conduct designed to prevent detection of their illegal activities, to conceal the location of proceeds of those activities, and to promote the carrying on of those activities.  The conduct engaged in by various members of the conspiracy included, among other things: the use of contracts to create an appearance of legitimacy for illicit payments; the use of various mechanisms, including trusted intermediaries, bankers, financial advisors, and currency dealers, to make and facilitate the making of illicit payments; the creation and use of shell companies, nominees, and numbered bank accounts in tax havens and other secretive banking jurisdictions; the active concealment of foreign bank accounts; the structuring of financial transactions to avoid currency reporting requirements; bulk cash smuggling; the purchase of real property and other physical assets; the use of safe deposit boxes; income tax evasion; and obstruction of justice.  Within the United States, such conduct took place within the Eastern District of New York and elsewhere.

V.   The Criminal Schemes

       52.  In connection with their activities with the
enterprise, the defendants JOSÉ HAWILLA, TRAFFIC SPORTS USA,
INC., and TRAFFIC SPORTS INTERNATIONAL, INC., together with
others, agreed to engage in multiple schemes, including schemes
involving the offer, acceptance, payment, and receipt of
undisclosed and illegal payments, bribes, and kickbacks.  Such
schemes related to numerous soccer events and other rights
associated with the sport.

       53.  Four such schemes are described in detail below:

A.   Copa América Bribery Scheme

       54.  In 1916, CONMEBOL organized the first edition of
the Copa América, a tournament featuring the men's national
teams of its members.  According to CONMEBOL, the tournament,
which continues to be played today, is the longest continuously-
running such tournament in the world.

       55.  In or about 1986, Traffic Brazil entered into
negotiations with CONMEBOL to acquire the media and marketing
rights associated with the Copa América.  On or about October 3,
1986, HAWILLA caused Traffic Brazil to enter into a $1.7 million
contract with CONMEBOL officials for the exclusive worldwide
commercial rights associated with the 1987 edition of the
tournament, to be held in Argentina and to be contested by its

21

10 members: Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela.

56.   Beginning with the 1987 edition and continuing thereafter through 2011, Traffic held the exclusive worldwide commercial rights for each edition of the Copa América tournament, which rights were secured through a series of contracts between Traffic and CONMEBOL.  As discussed further below, in 2013, TRAFFIC INTERNATIONAL formed a Uruguayan company with Sports Marketing Company A and Sports Marketing Company B called Datisa S.A. ("Datisa") that obtained the exclusive worldwide commercial rights for the 2015, 2016, 2019, and 2023 editions of the tournament.

57.   Beginning in the early 1990s, as the value of the rights associated with the commercialization of the Copa América increased, various CONMEBOL officials, including Co-Conspirator #1, began demanding bribe payments from HAWILLA in exchange for the performance of various acts, and HAWILLA agreed to pay.  As set forth below, the bribe payments began in the six figures (United States dollars) and ultimately were frequently in the seven figures.[1]

58.   The commercial rights to all editions of the tournament starting with the 1993 edition and continuing through

[1]   Unless otherwise specified, all currency amounts are in United States dollars.

the 2023 edition were obtained through bribery.  The table below
reflects the host nations, participation of the United States
men's national team, and commercial rights holders for each
edition of the tournament during this period:

| Edition | Host Nation | U.S. Team Participated | Commercial Rights Holder |
|---------|-------------|------------------------|--------------------------|
| 1993 | Ecuador | ✓ | Traffic Brazil |
| 1995 | Uruguay | ✓ | Traffic Brazil |
| 1997 | Bolivia | | Traffic Brazil |
| 1999 | Paraguay | | TRAFFIC INTERNATIONAL |
| 2001 | Colombia | | TRAFFIC INTERNATIONAL |
| 2004 | Peru | | TRAFFIC INTERNATIONAL |
| 2007 | Venezuela | ✓ | TRAFFIC INTERNATIONAL |
| 2011 | Argentina | | TRAFFIC INTERNATIONAL |
| 2015 | Chile | | Datisa |
| 2016 | United States | ✓ | Datisa |
| 2019 | Brazil | TBD | Datisa |
| 2023 | Ecuador | TBD | Datisa |

The 1991 Copa América Contract

     59.   On or about January 23, 1991, Traffic Brazil
entered into a contract with CONMEBOL to acquire the exclusive
worldwide commercial rights for the 1993, 1995, and 1997
editions of the Copa América (as amended, the "1991 Copa América
Contract").  The 1991 Copa América Contract, signed by HAWILLA
and three CONMEBOL officials in Asunción, Paraguay, was for $6.6
million: $2.2 million per edition.  On or about July 7, 1992,

after the United States and Mexico accepted invitations to compete in the 1993 edition of the tournament, the parties executed an addendum to the 1991 Copa América Contract increasing the price for the 1993 edition by 20%, to $2.64 million.  The addendum provided that a similar price increase would be required in the event the United States and Mexico also participated in the 1995 and 1997 editions.  The addendum was signed by HAWILLA and Co-Conspirator #1.

       60.  In addition to paying the rights acquisition fee specified in the contract, HAWILLA paid a bribe to Co-Conspirator #1 to obtain the latter's signature on the 1991 Copa América Contract.  On or about January 23, 1991, there was a signing ceremony at CONMEBOL headquarters in Asunción with other CONMEBOL officials.  At that time, HAWILLA signed the contract, as did the various CONMEBOL officials except Co-Conspirator #1.  Thereafter, in a private meeting, Co-Conspirator #1 told HAWILLA, in sum and substance, that HAWILLA would make a lot of money from the rights he was acquiring and that Co-Conspirator #1 did not think it was fair that he (Co-Conspirator #1) did not also make money.  Co-Conspirator #1 told HAWILLA that he would not sign the contract if HAWILLA did not agree to pay him a bribe.  After HAWILLA agreed to make the payment, Co-Conspirator #1 signed the contract.  HAWILLA caused the payment – a six-

24

figure U.S. dollar payment – to be made to an account designated by Co-Conspirator #1.

61.   In approximately 1993 or 1995, Co-Conspirator #1 began demanding additional bribe payments around the time each edition of the tournament contemplated by the 1991 Copa América Contract was played.   HAWILLA agreed to make these payments and caused them to be made.

The 1996 Copa América Contract

62.   On or about March 6, 1996, Traffic, operating through TRAFFIC INTERNATIONAL, entered into a new contract with CONMEBOL to acquire the exclusive worldwide commercial rights for the 1999, 2001, and 2003 editions of the Copa América (as amended, the "1996 Copa América Contract").   (In response to a later request by FIFA to ultimately make the tournament a quadrennial instead of biennial event to ease the pressure on European clubs, CONMEBOL moved the 2003 edition to 2004.   The move was part of a transitional period during which the tournament was held once every three years, in 2001, 2004, and 2007, before switching thereafter to a quadrennial format.)

63.   The 1996 Copa América Contract, signed by HAWILLA and nine CONMEBOL officials in Mar del Plata, Argentina, was for $24 million: $6 million for 1999, $8 million for 2001, and $10 million for 2003.   By virtue of a subsequent addendum

executed by the parties in 2001, the value of the contract increased by a further $4 million – reflecting a $2 million increase for each of the remaining two editions. The 1996 Copa América Contract expressly contemplated that the United States and Mexico might again be the two teams invited from other confederations to participate in the tournament.

64. Once again, in addition to paying the rights acquisition fee specified in the contract, HAWILLA paid a bribe to Co-Conspirator #1 to obtain the latter's signature on the contract. The bribe demand followed the same general pattern as with the 1991 Copa América Contract. Co-Conspirator #1 again withheld his signature from the contract and made the bribe demand in a private meeting with HAWILLA after HAWILLA and the other CONMEBOL officials had signed it. HAWILLA again agreed to make the payment, which was significantly higher, and caused the payment to be made to an account designated by Co-Conspirator #1.

65. In addition, Co-Conspirator #1 continued to demand additional bribe payments, in increasing amounts, around the time each edition of the tournament contemplated by the 1996 Copa América Contract was played. HAWILLA again agreed to make these payments and caused them to be made.

66.  As early as 1997, Traffic maintained bank accounts in the United States and used the wire facilities of the United States to transfer payments in connection with Traffic's exploitation of media and marketing rights associated with the Copa América.

67.  In 2004, TRAFFIC INTERNATIONAL used the wire facilities of the United States to transfer funds from its account at Delta National Bank & Trust Co. in Miami, Florida in satisfaction of the $12 million in contract payments due to CONMEBOL for the rights associated with the 2004 edition of the Copa América:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| January 12, 2004 | Wire transfer of $1,200,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| March 29, 2004 | Wire transfer of $3,600,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| May 13, 2004 | Wire transfer of $3,600,000 from TRAFFIC INTERNATIONAL's account at |

|  | Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| June 2, 2004 | Wire transfer of $3,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| June 3, 2004 | Wire transfer of $600,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |

<u>The 2001 Copa América Contract</u>

68.   On or about January 12, 2001, TRAFFIC INTERNATIONAL entered into a new contract with CONMEBOL to acquire the exclusive worldwide commercial rights for the 2005, 2007, and 2009 editions of the Copa América (as amended, the "2001 Copa América Contract").   (By virtue of the shift in schedule noted above, the three editions contemplated by this contract were ultimately re-scheduled to 2007, 2011, and 2015.)

28

69.   The 2001 Copa América Contract, signed by HAWILLA
and 14 CONMEBOL officials in Bogotá, Colombia, was for $46
million: $13 million, $15 million, and $18 million for the three
editions, respectively.  By virtue of subsequent agreements, the
value of the 2001 Copa América Contract increased by a further
$9 million – reflecting a $2 million increase for the 2007
edition and a $7 million increase for the 2011 edition.

70.   Once again, in addition to paying the rights
acquisition fee specified in the contract, HAWILLA paid a bribe
to Co-Conspirator #1 to obtain the latter's signature on the
contract.  The bribe scheme followed the same general pattern as
with the 1991 Copa América Contract and the 1996 Copa América
Contract.  Moreover, Co-Conspirator #1 again demanded an
additional payment in connection with the first tournament
contemplated by the 2001 Copa América Contract, and HAWILLA
again agreed to make the payment and caused it to be made.

71.   From 2006 to 2007, TRAFFIC INTERNATIONAL used the
wire facilities of the United States to transfer funds from its
account at Delta National Bank & Trust Co. in Miami, Florida in
satisfaction of the $15 million in contract payments due to
CONMEBOL for the rights associated with the 2007 edition of the
Copa América:

29

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| July 21, 2006 | Wire transfer of $3,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| March 14, 2007 | Wire transfer of $2,200,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| March 26, 2007 | Wire transfer of $2,800,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| May 30, 2007 | Wire transfer of $5,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asunción, Paraguay. |
| June 13, 2007 | Wire transfer of $2,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do |

Brasil correspondent account in
New York, New York, for credit to
an account in the name of CONMEBOL
at Banco do Brasil in Asunción,
Paraguay.

72.  From 2010 to 2011, TRAFFIC INTERNATIONAL again
used the wire facilities of the United States to transfer funds
from its account at Delta National Bank & Trust Co. in Miami,
Florida in satisfaction of the $22 million in contract payments
due to CONMEBOL for the rights associated with the 2011 edition
of the Copa América:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| November 8, 2010 | Wire transfer of $1,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |
| November 12, 2010 | Wire transfer of $4,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay. |
| March 4, 2011 | Wire transfer of $1,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to |

<table>
<tr><td></td><td>an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay.</td></tr>
<tr><td>June 10, 2011</td><td>Wire transfer of $9,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay.</td></tr>
<tr><td>June 28, 2011</td><td>Wire transfer of $7,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco do Brasil correspondent account in New York, New York, for credit to an account in the name of CONMEBOL at Banco do Brasil in Asuncion, Paraguay.</td></tr>
</table>

Money Laundering Techniques

73.    HAWILLA and his co-conspirators used a number of sophisticated money laundering techniques, including the use of a numbered account at a Swiss bank, currency dealers, and trusted intermediaries, to effect bribe and kickback payments in a manner that concealed their true source and nature and promoted the corrupt schemes.   HAWILLA was particularly reliant on intermediaries to make the bribe payments to Co-Conspirator #1 in connection with the Copa América, described above.   One such intermediary was a late friend of HAWILLA and two of that friend's surviving family members, Co-Conspirator #2 and Co-

32

Conspirator #3.  This family, which controlled the Intermediary, used accounts held in the names of offshore corporations at United States financial institutions to make payments on HAWILLA's behalf.

Revenues, Profits, and the United States Market

74.  The revenue generated by the commercialization of media and marketing rights associated with the Copa América increased dramatically over the course of the tournament editions covered by the 1991 Copa América Contract, 1996 Copa América Contract, and 2001 Copa América Contract, all of which HAWILLA obtained through bribery.  Over time, these increases in revenue, and associated increases in profits, arose in significant part from HAWILLA and Traffic's successful promotion and commercialization of the Copa América in the United States, including through contractual relationships with an array of broadcasters and advertisers based in the United States.

75.  For example, the 2001 Copa América – the second edition of the tournament played under the 1996 Copa América Contract – was quite profitable for Traffic.  According to its internal financial records, Traffic's revenues from the tournament totaled $31.9 million, with profits totaling over $9.9 million, owing in part to the sale of broadcast and

33

advertising rights to broadcast networks and beverage companies
based in the United States.

76. To take another example, the 2007 Copa América -
the first edition of the tournament played under the 2001 Copa
América Contract - was even more profitable for Traffic than the
2001 edition. According to its internal financial records,
Traffic's revenues from the tournament totaled $64.2 million,
comprising $45.9 million from the sale of broadcasting rights
and $18.3 million from the sale of sponsorship rights.
Traffic's profits from the tournament were $29.1 million.
Traffic's television broadcasting revenues from the United
States/Canadian market - $12.8 million - were its highest from
any market worldwide. Traffic's revenues from radio
broadcasting and mobile telephone/Internet services in the
United States market were similarly its highest worldwide.

77. The value of the sponsorship rights owned by
Traffic also increased over time, owing in part to increased
interest in the tournament in the United States. For example,
for the 2011 edition of the Copa América, Traffic sold
sponsorship rights to 10 official sponsors, up from seven
official sponsorships sold for the 2007 edition. The official
sponsors included major beverage companies based in the United
States. Sponsorship fees more than tripled between 2007 and

34

2011.   In a lawsuit filed in Florida state court, described

further below, Traffic described the 2011 Copa América as "the

most popular sporting event in the world in 2011[, which] was

watched by a cumulative audience of over five billion people

worldwide."

       78.   Traffic used its presence in the United States to

assist it in exploiting the United States market.   For example,

TRAFFIC INTERNATIONAL – the rights holder for the Traffic Group

beginning with the 1999 edition – assigned to TRAFFIC USA a

portion of the rights it held under the 2001 Copa América

Contract.   TRAFFIC USA exploited those rights in the United

States by contracting directly with television and radio

networks based in the United States and serving as an agent for

Traffic in connection with the sale of global sponsorship

rights.

The Florida Lawsuit and the 2013 Copa América Contract

       79.   In late 2011, TRAFFIC INTERNATIONAL and TRAFFIC

USA filed a complaint alleging breach of contract against

CONMEBOL and various affiliated officials and sports marketing

companies.   The lawsuit was filed in Florida state court by

virtue of a forum selection clause in the 2001 Copa América

Contract designating the courts of Florida as the forum of

choice in the event FIFA declined to arbitrate, as it ultimately
did.

　　　　80.　The original complaint alleged in pertinent part
as follows:

> This Complaint seeks urgent injunctive relief to
> prevent a willful, flagrant and deliberate breach of
> contract.  The contract at issue grants to Traffic the
> unique and exclusive rights to promote, market and
> commercially exploit the 44th edition of the Copa
> América soccer tournament to be conducted in 2015 and
> an option to retain those rights for the following
> three editions of the Copa América tournament.  The
> CONMEBOL defendants [CONMEBOL and its federations],
> who expressly granted those exclusive commercial
> rights to Traffic, have, without the least
> justification or defense, purported to enter into an
> agreement authorizing a third party . . . – Defendant
> [Sports Marketing Company A] – to exercise the very
> same rights.

(¶ 1).  According to the complaint, at a meeting held in April
2010, CONMEBOL, through its president and executive committee
and without Traffic's knowledge, passed a resolution granting
the rights to the 2015, 2019, and 2023 editions of the Copa
América, among other tournaments, to Sports Marketing Company A,
and entered into a contract with Sports Marketing Company A six
weeks later.  (¶ 77 & Ex. I).

　　　　81.　The lawsuit was settled in or about June 2013.

　　　　82.　In the months preceding the settlement, HAWILLA
and other representatives of Traffic began meeting with Co-
Conspirator #4, Co-Conspirator #5, and Co-Conspirator #6 – high-

ranking executives of Sports Marketing Company A and Sports Marketing Company B – to discuss a resolution of the lawsuit that would involve Sports Marketing Company A and Sports Marketing Company B agreeing to share with Traffic the commercial rights obtained by Sports Marketing Company A from CONMEBOL to exploit the above editions of the Copa América in exchange for Traffic agreeing to end the lawsuit and assume its share of the costs associated with those rights. Specifically, the representatives of the three companies discussed forming a new company that would obtain and exploit the commercial rights to the 2015, 2019, and 2023 editions of the tournament, as well as a special centennial edition of the tournament to be held in the United States in 2016.

83.    By in or about March 2013, the discussions regarding the formation of the company advanced significantly. Those discussions included settlement of the Florida state court litigation, the percentage of shares each member would hold in the new company, and the operations of the new company. After a larger meeting in Buenos Aires in or about March 2013, HAWILLA had a brief, smaller meeting with representatives of Sports Marketing Company A and Sports Marketing Company B.  A representative of Sports Marketing Company A told HAWILLA that Sports Marketing Company A and Sports Marketing Company B had

37

already agreed to make bribe payments to CONMEBOL officials in connection with the Copa América rights. HAWILLA was asked to contribute $10 million toward the cost of expenses to date. HAWILLA understood some or all of what he was being asked to contribute would go to bribe payments. HAWILLA agreed to make these bribe payments and caused them to be made.

84. The creation of the new company, Datisa, was formalized in a shareholders' agreement dated May 21, 2013. Among other things, the agreement provided that TRAFFIC INTERNATIONAL, Sports Marketing Company A, and Sports Marketing Company B each held a one-third interest in the company.

85. Four days later, in London, Datisa entered into a contract with CONMEBOL and Sports Marketing Company A whereby Datisa obtained from CONMEBOL the exclusive worldwide commercial rights to the 2015, 2019, and 2023 editions of the Copa América and the 2016 Copa América Centenario, and CONMEBOL and Sports Marketing Company A assigned to Datisa the contracts related thereto that they had already executed with third parties (the "2013 Copa América Contract"). The 2013 Copa América Contract, dated May 25, 2013 and signed by representatives of each of Datisa's three shareholders and 12 CONMEBOL officials, was for $317.5 million: $75 million for the 2015 edition, $77.5 million

for the 2016 edition, $80 million for the 2019 edition, and $85 million for the 2023 edition.

86.   Datisa agreed to pay $100 million in bribes to CONMEBOL officials – all of whom were also FIFA officials – in exchange for the 2013 Copa América Contract: $20 million for contract signature and $20 million for each of the four editions of the tournament.   Each $20 million payment was to be divided among the bribe recipients: $3 million to each of the "top" three CONMEBOL officials; $1.5 million to each of seven other CONMEBOL officials; and $500,000 to an eleventh CONMEBOL official.

87.   The following four payments, including three international wire transfers using the wire facilities of the United States, represent TRAFFIC INTERNATIONAL's one-third contribution to the other shareholders of Datisa, who were responsible for paying the first $40 million in bribes to the CONMEBOL officials (i.e., for contract signing and the 2015 edition), totaling $13.333 million.

| DATE | WIRE COMMUNICATION |
|---|---|
| June 17, 2013 | Wire transfer of $5,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Citibank correspondent account in New York, New York, for credit to an account in the name of Sports Marketing |

|                      | Company A at Banco Hapoalim Ltd. in Zurich, Switzerland. |
|----------------------|----------------------------------------------------------|
| June 17, 2013        | Wire transfer of $5,000,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a JP Morgan Chase correspondent account in New York, New York, for credit to an account in the name of Sports Marketing Company B at Bank Julius Baer & Co. in Zurich, Switzerland. |
| September 11, 2013   | Wire transfer of $1,666,667 from Datisa's account at Banco Hapoalim Ltd. in Zurich, Switzerland, via Citibank and JP Morgan Chase correspondent accounts in New York, New York, for credit to Sports Marketing Company B at Bank Julius Baer & Co. in Zurich, Switzerland. |

A fourth payment of $1,666,667 was made, also on or about September 11, 2013, by a transfer from an account in the name of Datisa S.A. at Banco Hapoalim Ltd. in Zurich, Switzerland to an account in the name of Sports Marketing Company A at the same bank.

Copa América Centenario

88.   In 2012, the then-acting president of CONCACAF informally announced that a special, Pan-America edition of the Copa América would be held in 2016, involving teams from CONMEBOL and CONCACAF, to celebrate the 100th anniversary of the first edition of the tournament.   The acting president stated

40

that he hoped the tournament would be hosted in the United
States because "the market is in the United States, the stadiums
are in the United States, [and] the people are in the United
States."

89.  At a press conference held in Miami, Florida on
May 1, 2014, high-ranking officials of CONMEBOL and CONCACAF
officially announced that CONMEBOL would celebrate the 100th
anniversary of the Copa América by organizing a special edition
of the tournament for the entire hemisphere – to be called the
Copa América Centenario – to include all 10 CONMEBOL men's
national teams and the men's national teams of six CONCACAF
member associations, including the United States.  The
tournament was to be played at major sporting venues in various
cities in the United States in June 2016.  Datisa
representatives attended the press conference and the logo of
Datisa's trade name was included alongside the logos of CONCACAF
and CONMEBOL in various promotional materials.

90.  As set forth above, Datisa acquired the exclusive
commercial rights to the Copa América Centenario as part of the
2013 Copa América Contract.  In addition, Datisa contracted with
CONCACAF, in its capacity as the co-organizer of the tournament,
to acquire CONCACAF's rights to that tournament as well.  By
letter agreement dated March 4, 2014 (the "2014 Centenario

41

Contract"), Datisa agreed to pay $35 million to CONCACAF for those rights, which amount was in addition to the $77.5 million Datisa had already agreed to pay to CONMEBOL, pursuant to the 2013 Copa América Contract, for CONMEBOL's rights to the same tournament.

91.   Co-Conspirator #7, a senior TRAFFIC USA executive, told HAWILLA that, following negotiations with Co-Conspirator #8, Co-Conspirator #9, and others, Datisa had agreed to pay a multi-million dollar bribe to Co-Conspirator #8 to secure the rights set forth in the previous paragraph.  HAWILLA agreed to the bribe payment.

92.   In August 2014, a high-ranking CONMEBOL official stated publicly: "The Americas are one, it is man who creates frontiers.  I believe in a single America in a working context with CONCACAF and we've reached something real which will go ahead in 2016."

93.   On or about September 25, 2014, at a meeting of the FIFA executive committee in Zurich, FIFA put its imprimatur on the Copa América Centenario by placing the tournament on its official calendar.

94.   By the terms of the 2014 Centenario Contract, the first contract payment of $7 million from Datisa to CONCACAF was

due on or about April 3, 2014.  International wire transfer
records confirm the payment:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| April 1, 2014 | Wire transfer of $6,999,950 from Datisa's account at Banco Hapoalim Ltd. in Zurich, Switzerland, to a JP Morgan Chase account in Miami, Florida in the name of CONCACAF. |

B.    CONCACAF Gold Cup Bribery Scheme

95.  In or about 1991, CONCACAF began organizing and
promoting the Gold Cup, a tournament featuring member nations of
CONCACAF and, in later years, those of other confederations.

96.  In or about 1992, HAWILLA relocated to the United
States for various reasons, including to seek additional
business opportunities for Traffic's United States affiliate in
the period leading up to the 1994 World Cup.  During this
period, HAWILLA and Co-Conspirator #10, a TRAFFIC USA executive
based in Miami, variously began negotiations with high-ranking
CONCACAF officials, including Co-Conspirator #11 and Co-
Conspirator #12, for TRAFFIC USA to purchase the media and
marketing rights associated with the Gold Cup.  HAWILLA's pitch
to CONCACAF, in sum and substance, was that Traffic could
replicate the commercial and sporting success it had had with
the Copa América and make the Gold Cup a similar success.  On or
about October 3, 1994, TRAFFIC USA entered into a contract with

43

CONCACAF for $9,750,000 for the commercial rights associated with the 1996, 1998, and 2000 editions of the Gold Cup.

97.  Beginning with the 1996 Gold Cup and continuing for four subsequent editions of the tournament (1998, 2000, 2002, and 2003), pursuant to the contract with TRAFFIC USA (as subsequently amended and renewed following additional negotiations), CONCACAF granted to TRAFFIC USA the exclusive worldwide commercial rights to the Gold Cup.

98.  During this period, HAWILLA and Co-Conspirator #10 together caused hundreds of thousands of dollars in bribe payments to be made to Co-Conspirator #11 and Co-Conspirator #12.

99.  Traffic did not hold the media and marketing rights associated with the Gold Cup for the 2005, 2007, 2009, and 2011 editions.

100. In 2011, Co-Conspirator #11 and Co-Conspirator #12 resigned from CONCACAF and were ultimately replaced the following year by two other high-ranking officials, Co-Conspirator #8 and Co-Conspirator #9.

101. Co-Conspirator #9, the former employee of TRAFFIC USA, entered into negotiations with TRAFFIC USA for the commercial rights associated with the 2013 Gold Cup.  Co-Conspirator #7 was involved in those negotiations on behalf of

44

TRAFFIC USA.  Ultimately, on or about November 27, 2012, CONCACAF and TRAFFIC USA entered into a $15.5 million contract for the exclusive worldwide commercial rights for the 2013 edition of the Gold Cup and the 2013-14 and 2014-15 seasons of the CONCACAF Champions League, a club tournament (the "2012 Gold Cup/Champions League Contract").

102. Co-Conspirator #7 told HAWILLA that, in addition to the contract price, TRAFFIC USA agreed to pay Co-Conspirator #8 an approximately $1 million bribe in exchange for Co-Conspirator #8's agreement to award the 2012 Gold Cup/Champions League Contract to TRAFFIC USA.  HAWILLA agreed to the bribe payment.

103. The following domestic and international wire transfers are examples of bribe and contract payments made in connection with the 2012 Gold Cup/Champions League Contract:

| DATE | WIRE COMMUNICATION |
|------|--------------------|
| February 15, 2013 | Wire transfer of $3,000,000 from TRAFFIC USA's account at Citibank N.A. in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank N.A. in New York, New York. |
| March 28, 2013 | Wire transfer of $1,000,000 from TRAFFIC USA's account at Citibank N.A. in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank N.A. in New York, New York. |

45

| June 28, 2013 | Wire transfer of $3,000,000 from TRAFFIC USA's account at Citibank N.A. in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank N.A. in New York, New York. |
| --- | --- |
| August 28, 2013 | Wire transfer of $2,500,000 from TRAFFIC USA's account at Citibank N.A. in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank N.A. in New York, New York. |
| December 4, 2013 | Wire transfer of $1,100,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Wells Fargo correspondent account in New York, New York, for credit to an account in the name of Company D, a Panamanian company, the identity of which is known to the United States Attorney, at Capital Bank Inc. in Panama City, Panama. |
| April 30, 2014 | Wire transfer of $1,500,000 from TRAFFIC USA's account at Citibank N.A. in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank N.A. in New York, New York. |

104. On or about November 15, 2013, TRAFFIC USA entered into a $60 million renewal contract for exclusive sponsorship rights associated with the 2015, 2017, 2019, and 2021 editions of the Gold Cup and the 2015-16, 2016-17, 2017-18, 2018-19, 2019-20, 2020-21, and 2021-22 editions of the CONCACAF Champions League (the "2013 Gold Cup/Champions League

Contract"). Co-Conspirator #7 led the negotiations on behalf of TRAFFIC USA and Co-Conspirator #9 led the negotiations on behalf of CONCACAF.

105. Co-Conspirator #7 told HAWILLA that, in addition to the contract price, TRAFFIC USA agreed to pay Co-Conspirator #8 a $2 million bribe in exchange for Co-Conspirator #8's agreement to award the 2013 Gold Cup/Champions League Contract to TRAFFIC USA. HAWILLA agreed to the bribe payment.

106. The following domestic wire transfer represents the only payment due under the 2013 Gold Cup/Champions League Contract until 2015:

| DATE | WIRE COMMUNICATION |
|---|---|
| December 20, 2013 | Wire transfer of $3,000,000 from TRAFFIC USA's account at Citibank N.A. in Miami, Florida, to CONCACAF's account at JP Morgan Chase Bank N.A. in New York, New York. |

C.   Sponsorship Bribery and Kickback Scheme

107. The Brazilian national team won the 1994 World Cup, which was hosted by the United States in June and July of that year. Around the same time, a representative of a multinational sportswear company headquartered in the United States ("Sportswear Company E") approached CBF to determine whether CBF, Brazil's national soccer federation and one of the

47

constituent member associations of FIFA, was interested in being sponsored by Sportswear Company E. At the time, CBF already had a sponsorship agreement with another American sportswear company ("Sportswear Company F"). Thereafter Co-Conspirator #13, a high-ranking CBF official, and HAWILLA, on behalf of Traffic Brazil, which at the time served as CBF's marketing agent, began negotiations with representatives of Sportswear Company E.

108. The negotiations lasted into 1996. The parties ultimately agreed to a 10-year deal, which required, among other things, that Sportswear Company E compensate Sportswear Company F, which agreed to terminate its existing contract with CBF.

109. On or about July 11, 1996, the parties met in New York City for the closing. The contract was executed by Co-Conspirator #13 on behalf of CBF, HAWILLA on behalf of Traffic Brazil, and four representatives of Sportswear Company E. Among other terms, the contract, a 44-page Sponsorship and Endorsement Agreement (the "Agreement"), required Sportswear Company E to pay CBF $160 million over 10 years for the right to be one of CBF's co-sponsors and to be CBF's exclusive footwear, apparel, accessories, and equipment supplier. CBF remitted a percentage of the value of the payments it received under the Agreement to Traffic Brazil.

110. HAWILLA agreed to pay and did pay Co-Conspirator #13 half of the money he made from the deal, totaling in the millions, as a bribe and kickback.

111. On or about January 25, 2002, the parties agreed to terminate the Agreement before the end of the 10-year term, ending any further obligations thereunder between Sportswear Company E and CBF, and between Sportswear Company E and Traffic Brazil.

D.    Copa do Brasil Bribery Scheme

112. Between approximately 1990 and 2009, Traffic Brazil entered into a series of contracts with CBF to acquire the commercial rights associated with the Copa do Brasil, an annual tournament for Brazil's top club teams.

113. From time to time during the above period, Co-Conspirator #13 would demand, and HAWILLA would pay, bribes in connection with the Copa do Brasil contracts.

114. On or about January 22, 2009, Traffic Brazil and CBF entered into three contracts covering the commercial rights for each edition of the Copa do Brasil tournament from 2009 through 2014.  Traffic Brazil agreed to pay approximately 55 million Brazilian reais, which at the time equated to approximately $23.4 million, for the rights.

115. On or about December 8, 2011, one of Traffic's competitors, Sports Marketing Company C, entered into a contract with CBF to purchase the commercial rights for all editions of the Copa do Brasil between 2015 and 2022. Sports Marketing Company C agreed to pay approximately 128 million reais, which at the time equated to approximately $70.6 million, for the rights.

116. The signing of the foregoing contract led to a dispute between HAWILLA and Co-Conspirator #14, a senior executive of Sports Marketing Company C.

117. On or about August 15, 2012, Traffic Brazil and Sports Marketing Company C entered into a contract to pool their marketing rights for future editions of the tournament, from 2013 to 2022, and to share equally in the profits. As part of the contract, Traffic Brazil also agreed to pay 12 million reais to Sports Marketing Company C over the course of the contract.

118. Co-Conspirator #14 informed HAWILLA that he had agreed to pay a yearly bribe to Co-Conspirator #13. Co-Conspirator #14 informed HAWILLA that he had traveled to the United States at one point to discuss the matter with Co-Conspirator #13. Co-Conspirator #14 informed HAWILLA that the bribe payment subsequently increased when other CBF officials, specifically, Co-Conspirator #15 and Co-Conspirator #16,

50

required bribe payments as well.  HAWILLA agreed to pay half the cost of the bribe payments, which totaled 2 million reais per year, to be divided among Co-Conspirator #13, Co-Conspirator #15, and Co-Conspirator #16.

119. The following two wire transfers using the wire facilities of the United States - one from TRAFFIC INTERNATIONAL, the other from Sports Marketing Company C - were made in furtherance of the Copa do Brasil bribery scheme:

| DATE | WIRE COMMUNICATION |
| --- | --- |
| December 5, 2013 | Wire transfer of $500,000 from Sports Marketing Company C's account at Itau Unibanco S.A. in New York, New York, to a J.P. Morgan Chase correspondent account in New York, New York, for credit to the account of a luxury yacht manufacturer at HSBC Bank PLC in London, England. |
| December 23, 2013 | Wire transfer of $450,000 from TRAFFIC INTERNATIONAL's account at Delta National Bank & Trust Co. in Miami, Florida, to a Banco Itau S.A. account in New York, New York in the name of Sports Marketing Company C. |

* * * *

120. Though HAWILLA's co-conspirators in the foregoing bribery and kickback schemes included FIFA and CONCACAF officials, among others, no disclosure of any of the foregoing

51

schemes was made to the FIFA or CONCACAF executive committee or congress.

COUNT ONE
(Racketeering Conspiracy)

121. The allegations contained in paragraphs 1 through 120 are realleged and incorporated as if fully set forth in this paragraph.

122. In or about and between January 1991 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSÉ HAWILLA, together with others, being a person employed by and associated with the enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of such enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5).

123. The pattern of racketeering activity through which the defendant JOSÉ HAWILLA, together with others, agreed to conduct and participate, directly and indirectly, in the

conduct of the affairs of the enterprise consisted of multiple acts indictable under:

> (a) Title 18, United States Code, Section 1343 (wire fraud, including honest-services wire fraud);
>
> (b) Title 18, United States Code, Sections 1956 and 1957 (money laundering and money laundering conspiracy);
>
> (c) Title 18, United States Code, Section 1952 (interstate and foreign travel in-aid-of racketeering); and
>
> (d) Title 18, United States Code, Section 1512 (obstruction of justice);

and multiple acts involving bribery, in violation of New York State Penal Law Sections 180.03 and 180.08.  HAWILLA agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, the last of which would occur within 10 years of a prior act of racketeering activity.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 et seq.)

COUNT TWO
(Wire Fraud Conspiracy - Copa América Bribe Scheme)

124. The allegations contained in paragraphs 1 through 120 are realleged and incorporated as if fully set forth in this paragraph.

125. In or about and between April 2010 and February 2014, both dates being approximate and inclusive, within the Southern District of New York, the defendants JOSÉ HAWILLA, TRAFFIC SPORTS USA, INC., and TRAFFIC SPORTS INTERNATIONAL, INC., together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud FIFA and CONCACAF, including to deprive FIFA and CONCACAF of their respective rights to honest and faithful services through bribes and kickbacks, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, to wit: wire transfers, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

54

COUNT THREE
(Money Laundering Conspiracy - Copa América Bribe Scheme)

126. The allegations contained in paragraphs 1 through 120 are realleged and incorporated as if fully set forth in this paragraph.

127. In or about and between April 2010 and February 2014, both dates being approximate and inclusive, within the Southern District of New York, the defendant JOSÉ HAWILLA, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, to wit: wire transfers, from places in the United States to and through places outside the United States and to places in the United States from and through places outside the United States, with the intent to promote the carrying on of specified unlawful activity, to wit: wire fraud, contrary to Title 18, United States Code, Section 1343, all contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

55

## COUNT FOUR
(Obstruction of Justice)

128. The allegations contained in paragraphs 1 through 120 are realleged and incorporated as if fully set forth in this paragraph.

129. In or about and between June 2012 and February 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSÉ HAWILLA, together with others, did knowingly, intentionally and corruptly (1) attempt to persuade another person, to wit: John Doe, an individual whose identity is known to the United States Attorney, with intent to hinder, delay and prevent the communication to one or more law enforcement officers of the United States, to wit: Special Agents of the Federal Bureau of Investigation, of information relating to the commission and possible commission of federal offenses, and (2) obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding, to wit: a Federal Grand Jury investigation in the Eastern District of New York.

(Title 18, United States Code, Sections 1512(b)(3), 1512(c)(2) and 3551 et seq.)

56

CRIMINAL FORFEITURE ALLEGATION AS TO COUNT ONE

130. The United States hereby gives notice to the
defendant JOSÉ HAWILLA that, upon his conviction of the offense
charged in Count One, the government will seek forfeiture in
accordance with Title 18, United States Code, Section 1963(a),
which requires any person or entity convicted of such offense to
forfeit: (a) any interest acquired or maintained in violation of
Title 18, United States Code, Section 1962; (b) any interest in,
security of, claim against, or property or contractual right of
any kind affording a source of influence over, any enterprise
which the defendant established, operated, controlled,
conducted, or participated in the conduct of, in violation of
Title 18, United States Code, Section 1962, and (c) any property
constituting, or derived from, any proceeds obtained, directly
or indirectly, from racketeering activity in violation of Title
18, United States Code, Section 1962.

131. If any of the above-described forfeitable
property, as a result of any act or omission of the defendant:

(a)  cannot be located upon the exercise of due
diligence;

(b)  has been transferred or sold to, or
deposited with, a third party;

57

(c)   has been placed beyond the jurisdiction of the court;

(d)   has been substantially diminished in value; or

(e)   has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNT TWO

132. The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any and all property, real or personal, which constitutes or is derived from proceeds traceable to a violation of such offense.

133. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

<u>CRIMINAL FORFEITURE ALLEGATION AS TO COUNT THREE</u>

134. The United States hereby gives notice to the defendant JOSÉ HAWILLA that, upon his conviction of the offense charged in Count Three, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any and all property, real or personal, involved in such offense, or any property traceable to such offense.

135. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18,

60

United States Code, Section 982(b), to seek forfeiture of any

other property of the defendant up to the value of the

forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and

982(b); Title 21, United States Code, Section 853(p))

LORETTA E.  LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

61